CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

LINA PENG (NYBN 5191295)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7224
FAX: (415) 436-7234
Lina.Peng@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOEL DOWEN,<br><br>MICAH-LUC ALMEIDA,<br><br>Defendants. | NO. CR 24-00017 JST; 25-000063 JST<br><br>UNITED STATES SENTENCING MEMORANDUM |

This case presents a truly horrific set of crimes with consequences that are difficult to understate. Joel Dowen is dangerous. Through his actions, Dowen has demonstrated that he has no regard for human life or basic decency. In pursuit of even more illicit drug proceeds than what he had already been earning with co-defendant Micah-Luc Almeida, Dowen embarked on a campaign of terror against a victim and their family.[1] This included arranging for the brutal assault of an innocent 80-year-old man, inflicting life-threatening injuries and trauma that reverberate to this day. In the words of that elderly victim, "life will never be the same." He and his wife were forced to leave in fear from the "forever

[1] The government understands that some victims intend to address the Court at the sentencing hearing. The parties have agreed that they may withhold their names from the public record.

house" and beloved community they had called home for 47 years. The upheaval and pain caused to their entire family and community will persist for a very long time.

Beyond that, Dowen and Almeida conspired in large-scale drug manufacturing of MDA,[2] psilocin, and marijuana and have been selling the substances in mass for years. When Almeida's drug lab was searched, law enforcement found thousands of tablets and hundreds of kilograms of waste material from attempted manufacture of MDA. While Almeida is not charged with extortion, it is worth noting that when Dowen conveyed to Almeida what he had been doing to the victims—including the assault and setting fire to the victim's home—Almeida expressed strong approval of Dowen's actions. When asked by Dowen to participate in the extortion, Almeida appeared readily willing to do so.

Fitting his pattern of violence, Dowen fired on agents when they went to arrest him, striking one of the agent's shields in a highly dangerous situation that could have been even worse. Many defendants come before the Court, and the Court can only speculate to a degree regarding their danger to the community. Not so here. Dowen's record—through his litany of crimes and demonstrable willingness to engage in deadly violence—requires the Court to protect the community and achieve justice through punishment. Only a significant and lengthy sentence will achieve the Section 3553(a) purposes of sentencing mandated by Congress. Almeida should be sentenced in his own right for his crimes—his complicity and apparent support of Dowen's actions at a minimum are informative of his character and deserve due consideration by the Court in fashioning a just sentence.

## I. Background and Offense Conduct

On March 24, 2024, a four-count Superseding Indictment was filed against Dowen and Almeida. Dowen was charged with mailing threatening communications with intent to extort, in violation of 18 U.S.C. § 876(b) (Count One), and assault on a federal officer with a deadly weapon, in violation of 18 U.S.C. § 111(b) (Count Two). Both Dowen and Almeida were charged with conspiracy to manufacture, distribute and possess with intent to distribute MDA, in violation of 21 U.S.C. §§ 846, 841(a)(1) and

[2] MDA, or 3-4-methylenedioxyamphetamine, is a synthetic drug closely related to MDMA (also referred to as Ecstasy or Molly). MDMA is typically distributed in tablet form, and many so-called ecstasy tablets often contain other substances like MDA, ketamine, methamphetamine, opioids, either alone or in combination with MDMA. *See https://www.deadiversion.usdoj.gov/drug_chem_info/mdma.pdf.*

(b)(1)(C) (Count Three), Almeida was additionally charged with possession with intent to distribute MDA, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) (Count Four). On March 11, 2025, a one-count Indictment was filed against Dowen, charging him with bank fraud in violation of 18 U.S.C. § 1344.

Bank Fraud

Beginning no later than September 2019, Dowen agreed with two other individuals to engage in a scheme to defraud Flagstar Bank through using misrepresentations to obtain a mortgage for a property located in Concord, California. Dowen PSR ¶ 34. As a result of the scheme, Flagstar Bank provided Dowen's co-conspirator with a $725,000 mortgage. *Id.* ¶ 35. In sum, Dowen used a straw purchaser to qualify for the mortgage and lied about the purpose of the purchase. *Id.* ¶ 34. Dowen was the real source of funds and was going to reside at the property, rather than the co-conspirator who applied for the mortgage. *Id.* Dowen used the co-conspirator's identity because Dowen himself would not have been approved for the loan based on his credit score. *Id.* ¶ 35. Dowen provided the co-conspirator with all the payments associated with the mortgage, using primarily the proceeds of drug trafficking. *Id.*

Drug Trafficking

Beginning in January 2020, Dowen and Almeida agreed to manufacture federally controlled substances for sale, including MDA and psilocin pills. Almeida PSR ¶ 19. The scale of this conspiracy was massive and continued for years before being finally taken down by law enforcement as part of the instant case. As examples of the quantity that was being manufactured, on January 9, 2020, Almeida texted Dowen providing him instructions how to manufacture "50,000 blue MDA pills," *id.* Later that year, Almeida and Dowen that they were about to get "200lbs of mushrooms . . . Depending on demand we can make as many as we want," *id.* ¶ 20. Almeida and Dowen discussed selling over 30,000 tablets in three days, and "60k every 2 weeks" of mushrooms. *Id.* ¶ 22. Almeida discussed with Dowen that they were producing a stronger version of MDA that's "kinda revolutionary." *Id.* Beyond the conspiracy to manufacture the controlled substances, Dowen and Almeida were, of course, also distributing them to others for money. *See id.* ¶ 23.

On the day that law enforcement searched the drug lab, they seized hundreds of kilograms of waste material from the attempted manufacture of MDA. *Id.* ¶ 21. When Almeida's residence in San

Francisco was searched, law enforcement seized 2,519 tablets containing MDA and psilocin, 2,087 tablets containing psilocin, and 624 grams of mushrooms containing psilocin. *Id.* ¶ 21. Dowen agreed, for Guidelines purposes, that he is responsible for between 1,000 to 3,000 kilograms of converted drug weight (base offense level 30).[3] Dowen Plea Agmt. Almeida agreed, for Guidelines purposes, that he is responsible for between 3,000 to 10,000 kilograms of converted drug weight (base offense level 32). Almeida Plea Agmt. The PSR noted that the government[4] and defense counsel agree that the base offense level is 28 and not 32. Almeida PSR ¶ 4 n1. The amounts reflected in the plea agreements and PSR, which the government agrees should be relied upon by the Court for Guidelines calculation, likely vastly underestimate the quantity of controlled substances that Almeida and Dowen actually manufactured and distributed during the years of the conspiracy.

<u>Extortion</u>

The criminality underlining the extortion scheme in this case shocks the conscience. In 2019, Dowen was introduced to Victim 1 by Almeida as someone who could help Victim 1 recover stolen LSD. Dowen PSR ¶ 14. Dowen was able to do so, and Victim 1 paid Dowen $1.5 million in exchange. *Id.* Almeida then demanded an additional $250,000 worth of LSD as a finder's fee; Victim 1 refused and cut off contact with Dowen and Almeida. *Id.* Beginning around two years later, in 2021 (while Dowen and Almeida were operating their drug lab as described above), Dowen begin extorting Victim 1 through threats of violence and demanded additional money. *Id.* ¶ 15. Victim 1 paid Dowen an additional $ 4 million, and understood from Dowen that a portion was going to Almeida. *Id.*

In 2022, Dowen attempted to contact Victim 1 again and when Victim 1 did not respond, began a pattern of threats and violence against Victim 1 and his family. *Id.* ¶ 16. On February 18, 2023, Dowen drove to a property in Mendocino County he believed was occupied by Victim 1's associates. *Id.* ¶ 17. He pointed into a Ring camera near the front door and stated, "yeah, it's me motherfucker, I'm coming for you." *Id.* Dowen spraypainted "CALL" on the side of the home and on an RV on the

---

[3] The PSR stated the weight to be more than 400 kilograms but less than 700 kilograms. Dowen PSR ¶ 33.

[4] The undersigned took over in this matter in June 2026 from prior government counsel and thus was not a party to these discussions. However, the government will abide by the agreement as indicated in the PSR.

property, and as he drove off, Dowen discharged a firearm. *Id.*

On March 17, 2023, Dowen arranged for three individuals to break into the home of Victim 1's 80-year-old father and assault him. *Id.* ¶ 18. This resulted in Victim 1's father being hospitalized with multiple broken ribs, a pulmonary embolism, a broken nose, multiple facial lacerations, a concussion, multiple instances of deep vein thrombosis in his legs from being kicked, and degloving (life-threatening trauma to the skin) on the skin on his wrists from zip ties used to restrain him to a chair. *Id.*

Even after the horrific March 17, 2023, assault, Dowen continued his campaign of terror and extortion. Dowen sent numerous threatening letters to Victim 1, including threats to Victim 1's family members.

On April 8, 2023, Dowen mailed Victim 1 a copy of an article about the assault, along with a letter that read, "look this can either go away or escalate . . . ignoring me will cause it to escalate . . . if I don't get what I am owed it will escalate . . . so I will leave it up to you but I am not goin away just cause you ignore me . . . that is the wrong choice for a lot of people and I am not going to keep cool for long so call me or call each other than [sic] call me or whatever but let's end this before it gets bad . . . everything is up to you guys." Dowen PSR ¶ 19. This was sent about three weeks after the assault on Victim 1's father. And yet, Dowen apparently did not think things were bad yet and was threatening even worse.

In an August 2023 email, Dowen wrote, "I am getting real close to sending another message because I can't get your attention . . . [I] am coming after [Associate 1] for 2 . . . [y]ou will just ignore me . . . tell [Associate 1] to ignore me . . . But wen [sic] I do what I got planned I will tell the person [Victim 1] and [Victim 1's father] told me that they didn't care to do it and see . . . It will probably be your sister that [] chick or [] or her mom . . . Or maybe the fags . . . And tell them to thank you." Dowen PSR ¶ 21. Dowen admitted in his plea agreement that when he wrote "I am getting real close to sending another message," he was threatening additional violence against Victim 1 or his family members. *Id.* ¶ 22.

On October 30, 2023, Dowen flew from Oakland to San Diego and drove to Victim 1's home, spraypainted "CALL ME" on the side of the home and set the home on fire, causing major damage to the living room, stairs, dining room, kitchen and upstairs area. Dowen PSR ¶ 23. After Dowen set fire

to the home, he took a photograph of the smoke and texted Almeida with the messages, "[h]appy birthday," "[c]all me Johnny blaze," "[h]opefully they get the point," and "[w]onder if I get a call now," along with a link to a local news article about the fire. *Id.* Almeida responded, "[f]uck yeah. Was trying to figure out which place but I know now from the trees," "[l]ol," "[h]ahaha," "[f]ucking rad. Finished the job," and "[f]uck yes. Fuck [victim]!!!" Almeida PSR ¶ 16.

On October 8, 2023, and October 30, 2023, Dowen sent several emails to Victim 1's sister, "I sure hope your brother cares about you and your parents are in the hot seat because of him . . . Ask him about his work house and your dad ask him if he is going to stop it before it escalates . . . Because as of now he is hanging you guys out to dry." Dowen PSR. ¶ 24.

On November 18, 2023, Dowen shared an image of a letter with Almeida that referenced letters Dowen sent Victim 1, including the April 8, 2023, letter, in which Dowen had enclosed a copy of an article about the assault on Victim 1's father. Dowen wrote to Almeida, "[t]hat is a rat PERIOD" and "[t]his is a rat." Almeida responded, "[w]oah . . . He put his name on the dotted line," and "well there's mothing implying anything other than getting what Dowen is owed." Almeida PSR ¶ 17.

On December 2, 2023, Dowen wrote, "if you think your dad can't be found to get another visit, you're sadly mistaken would you like his address?" Dowen PSR ¶ 25. Dowen admitted in his plea agreement that he was telling Victim 1 that if he did not comply with Dowen's demands, he would have Victim 1's father assaulted again. *Id.* ¶ 26

On December 30, 2023 and January 1, 2024, Dowen tried to call Victim 1's cousin and left a voicemail stating, "[h]ey, I really don't want to visit you or your mom, so get that message to [Victim 1] and let him know I need that call today." *Id.* ¶ 27. Dowen admitted in his plea agreement that he was threatening Victim 1's cousin and aunt with violence. *Id.* On January 3, 2024, Dowen called Victim 1's elderly aunt and left a voicemail stating, "I need to hear from [Victim 1] today or more people are going to get visits. I'm really sorry but gaming play time is over." *Id.* Dowen admitted in his plea agreement that he was threatening violence in that message. *Id.*

On January 5, 2025, Dowen sent Almeida a screenshot with Victim 1's sister's phone number, email address, and physical address, and wrote, "[h]ow close is that to you? Could you tape a note with my burner number to the door." Almeida responded, "[y]es," "[s]uper close," and "[w]hat's the burner

number. Il [sic] go do it." Almeida PSR ¶ 18. Dowen provided Almeida with the number, to which Almeida responded, "Jesus," "[t]his is the sister?" *Id.* Almeida then wrote, "I'm [gonna] make sure it's not a trap," and, after Dowen sent the corrected phone number, Almeida wrote, "[h]aven't dropped it yet," "I'm [gonna] wait til daytime." *Id.*

Assault on Federal Officer with a Deadly Weapon

On January 17, 2024, at approximately 6 a.m., federal law enforcement arrived at Dowen's residence to execute a search warrant and arrest him. Dowen PSR ¶ 28. Agents made their presence known, including using flashing emergency lights, sirens, and a PA device. *Id.* Agents made an announcement over the PA device three times. *Id.* After receiving no response, agents breached the front door. *Id.* Dowen fired two shots from his handgun through the front door towards the agents, one of which hit a protective shield being carried by a DEA agent. *Id.* Dowen remained barricaded in the residence, and after several minutes of agents calling him out of the house, an unidentified woman exited the garage and surrendered. *Id.* ¶ 29. She called Dowen, who responded that he was nervous he injured law enforcement. *Id.* Dowen was seen pacing the second story of his residence, and a few minutes later, he exited the front door with his hands up. *Id.* Dowen admitted in his plea agreement that when he fired the shots at the agents, he did not believe that force was necessary to defend himself against an immediate use of unlawful force. *Id.*

## II. Guidelines Calculation

### a. Defendant Dowen

In accordance with the plea agreement entered into by the parties, the United States' position is that Mr. Dowen's total offense level is 37.[5] The government acknowledges that the Probation department arrives at a total offense level of 36 and takes issue with the specific calculation in the plea agreement.

For Count One (Extortion), the government agrees with the base offense level, and the specific offense characteristics set forth in ¶¶ 40, 41, 43-46. The government disagrees with the six-level enhancement being applied under U.S.S.G. §§ 2B3.2(b)(2), 2B3.1(b)(7)(G) in Dowen's PSR. The

[5] The plea agreement left open the possibility for the parties to argue at sentencing whether a six-point or a seven-point increase was appropriately applied under U.S.S.G. § 2B3.2(b)(2).

government submits that there should be a seven-level increase for the total amount demanded of $10 million—to include $4 million that Victim 1 paid to Dowen in 2021, *id.* ¶ 15, and the additional $4 million and $2 million that Dowen demanded from Victim 1 and a third-party subsequently in 2023, *id.* ¶¶ 21-22, 42. $10 million exceeds $950,000, corresponding to a seven-level increase. U.S.S.G. §§ 2B3.2(b)(2), 2B3.1(b)(7)(H).

The government agrees that the Criminal History category for Dowen is I. Based on the plea agreement, Dowen's Guidelines total combined offense level is either 36 or 37. The government submits that it should be 37 given the seven-level increase described above, which would correspond to a Guidelines range of 210 to 262. Probation calculates Dowen's Guidelines range, corresponding to total combined offense level of 36, to be 188 to 235 months. Probation is recommending 200 months on all four counts to run concurrently. The government recommends 210 months of imprisonment.

**b. Defendant Almeida**

In the plea agreement entered by the parties, Almeida's total offense level was 29. However, as noted above, the government and defense counsel have since agreed that the base offense level is 29 and not 32, bringing the total offense level to 25. The Guidelines range associated with total offense level 25 is 57 to 71 months.

The government agrees that Almeida is in Criminal History Category I. Probation recommends 42 months to run concurrently on both counts. The government recommends a term of imprisonment of 46 months.

## III. Recommended Sentence

**a. Legal Standard**

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing set forth by Congress in 18 U.S.C. § 3553(a)(2). *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Sentencing Guidelines. *See id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *See id.* at 991-93.

In arriving at the appropriate sentence, and in accordance with 18 U.S.C. § 3553(a), the Court

should consider these factors applicable to the case, among others:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;
>
> (4) the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (5) the need to provide restitution to any victims of the offense.

**b. Government's Recommended Sentence and 3553(a) Factors**

Dowen

The government recommends that the Court sentence Dowen to 210 months of imprisonment, to run concurrently on all four counts, followed by 10 years of supervised release as authorized by Count 3. The government requests that the Court order restitution in the amount of $2,203,392.13 as agreed to in the plea agreement and forfeiture of the property as agreed to in the plea agreement, including the real property located at 1259 Quiet Circle, Concord, California.

Dowen's criminal conduct was egregious and wide-ranging. From fraud, to drug dealing, to violent extortion and shooting at federal officers, Dowen has made a career of crime. More than that though, there is a callousness to Dowen's crimes that bears underscoring and that warrants serious consideration by the Court. To the extent that there is truth to the phrase, "there is honor among thieves," Dowen has none. Dowen had no qualms about threatening and harming innocent parties who, but for their familial relationship to the victim, had nothing to do with the drugs or crimes Dowen and his associates were involved in. Not only that, but Dowen targeted an elderly, vulnerable person as part of his campaign of terror—a step he did not have to take to achieve his extortionary goals. That victim easily could have died from the horrific injuries inflicted that day, and that suffering of that victim continues to this day both physical and psychological, along with that of his entire family and loved ones.

Dowen's attitude towards what he had done is also telling of his character and dangerousness.

After the assault on the elderly victim, rather than feeling any remorse, Dowen escalated. About three weeks after the assault, Dowen sent Victim 1 a copy of the article about the assault and a letter that stated, among other things, "call me or whatever but let's end this before it gets bad." In Dowen's mind, apparently, the assault that nearly killed the elderly victim was not bad. About five months later, Dowen threatened Victim 1, "I am getting real close to sending another message . . . I will tell the person [Victim 1] and [Victim 1's father told me they didn't care to do it and see . . . It will probably be your sister . . . or her mom . . . or maybe the fags . . . And tell them to thank you." Given the assault, it is difficult to imagine the level of terror and stress this would have caused to Victim 1's family. Dowen then sent an article about the assault to his co-defendant Almeida, stating "[t]his is a rat PERIOD," was still threatening the victim about nine months later, "if you think your dad can't be found to get another visit, you're sadly mistaken would you like his address?" and admitting that he was going to have the elderly victim assaulted again.

About seven months after the assault, Dowen literally set Victim 1's house on fire. It is unknown whether Dowen checked first if anyone was inside or whether he cared. His attitude towards setting the fire was one of glee, writing to his co-defendant Almeida, "[h]appy birthday," "[c]all me Johnny blaze," "[h]opefully the get the point," and "[w]onder if I get a call now," along with a link to a local news article about the fire. Almeida responded, "[f]uck yeah. Was trying to figure out which place but I know now from the trees," "[l]ol," "[h]ahaha," "[f]ucking rad. Finished the job."

It is worth noting that the apparent reason Dowen committed these violent acts was pedestrian, making them all the more sinister. These actions had nothing to do with vengeance or righting some perceived wrong—even if ill conceived—they had to do with Dowen wanting to make more money from illicit drugs—on top of the no doubt large amounts money he was already making from illicit drug conspiracy he had with Almeida.

The government acknowledges that Dowen had very difficult circumstances in his childhood, which likely play a part in creating his anti-social and violent behaviors. Nevertheless, even if it is a sad path that led him here today, the grown and dangerous man Dowen is today is who the Court must evaluate.

And that is a man who when he was finally about to be arrested, fired shots at federal agents. He

successfully hit one of their shields, in yet another example in a pattern of violent behavior and disregard for human life. Dowen knew these were federal agents because they had made their presence known.[6] Rather than surrender, he chose to take the extremely dangerous action of shooting at them. Fortunately, no one was killed, but Dowen—as he has done before—created a situation where he directly put the lives of others (including in this case himself and the other occupant of the residence) at serious risk.

Dowen deserves serious punishment for the serious crimes that he has committed. His character reflects an individual who will go to any means necessary to serve his own ends with no regard or concern for the lives of others. The offense conduct, history and characteristics of the defendant, protection of the public, respect of the law, just punishment and deterrence all weigh in favor of the government's recommendation.

Almeida

The government recommends that the Court sentence Almeida to 46 months of imprisonment, to run concurrently on the two counts, followed by 3 years of supervised release. Almeida should be sentenced in his own right, and the government's recommendation of 46 months is appropriate given the nature of the crimes here, the need for specific deterrence, and protection of the public. Almeida has asked for probation, which is insufficient to achieve the statutory purposes of sentencing.

For years, Almeida ran a drug lab on a large scale that created serious public harm. The controlled substances that he was attempting to manufacture and actually distributed were harmful to their recipients, particularly given that Almeida has no discernable training in chemistry or any related subjects that would provide him with the necessary safety know-how on how to handle, let alone concoct, controlled substances. The drug manufacturing activity resulted in large quantities of waste material, the impact of which is difficult to measure. The suggestion that these controlled substances are somehow beneficial and that Almeida was motivated by an academic interest is misplaced. He was motivated by money and greed. While it is true that there are more harmful drugs, MDA and psilocybin present risks also,[7] particularly if contaminated with other substances, as is possible in illicit distribution

[6] Dowen argues that did not know they were federal agents. Even if that were the case, Dowen was still shooting at people and there is no indication that he needed to defend himself with deadly force.

[7] *See, e.g.*, California Poison Control System (describing risks of psilocybin to include dangerous

networks. The Guidelines and the government's recommendation account for the nature of the drugs here already; bluntly put, the government would not be recommending 46 months if Almeida had been operating a methamphetamine lab. And as this case makes clear, illicit drug dealing creates ancillary public harm beyond the drugs themselves.

As reflected in his PSR, Almeida himself grew up around drugs and drug trafficking, including experiencing his father's imprisonment for drug trafficking when he was eight years old. While that aspect of his upbringing was no question a hardship for Almeida, he apparently did not learn any lessons from his father's experience and instead turned to drug trafficking himself. On the one hand, it is perhaps mitigating that Almeida has demonstrated himself capable of legitimate work and study, including at UC Berkeley. On the other hand, it is aggravating because he has had opportunities to succeed and is clearly capable of doing so, but chose instead to traffic drugs and associate himself with Dowen. It is notable that Almeida enrolled at UC Berkeley again *after* he was charged in this case, and he chose to volunteer *after* he was charged in this case—knowing full well that this Court would be informed. This is not to detract from Almeida's progress, but to highlight that there is another side to Almeida that the Court needs to consider.

That side is of an individual who, beyond the drug trafficking, was at least complicit in horrible crimes and worse, appeared to celebrate them.[8] While it is true that Almeida did not commit the same crimes as Dowen—accounted for in the government's respective sentencing recommendations—there is no question that Almeida approved of and did nothing to stop Dowen's actions. The Court can consider that as part of Almeida's characteristics under 3553(a). It is undisputed that Almeida introduced the victim to Dowen as someone who could recover stolen drugs; that Almeida demanded $250,000 from the victim; that Almeida and Dowen together approached the victim to make demands in 2021; and that

---

behavior, physical side effects, mental health issues, fear and paranoia, and toxic look-alikes) https://calpoison.org/about-magic-mushrooms-psilocybin-safety (last accessed, Jul. 31, 2026); PMC PubMed Central, *MDMA and the Brain: A Short Review on the Role of Neurotransmitters in Neurotoxicity* (describing MDMA's abnormal regulation of brain transmitters and increased oxidative stress causing damage to brain after MDMA exposure), https://pmc.ncbi.nlm.nih.gov/articles/PMC7878040/ (last accessed, Jul. 31, 2026).

[8] Besides what is reported in the PSR, the government has no further information regarding Almeida's dispute regarding whether he provided Dowen with Victim 1's true name, home address, or family information. It also submits that the Court need not resolve that dispute, but rather can take into account the undisputed facts referenced herein regarding Almeida and the extortion.

Almeida approached the victim another time again that year with the same demands. Almeida PSR ¶¶ 9-10.

Further, it is undisputed that when Dowen sent Almeida a photo of the house he set on fire in October 2023 along with a news article, Almeida responded, “[f]uck yeah. Was trying to figure out which place but I know now from the trees,” “[l]ol,” “[h]ahaha,” “[f]ucking rad. Finished the job,” and “Fuck yes. Fuck [victim]!!!” Almeida PSR ¶ 16. That is someone laughing and cheering on the crime of a collaborator, not someone trying to appease.

In November 2023, when Dowen sent Almeida an article about the assault on Victim 1’s father, Dowen wrote “[t]hat is a rat PERIOD” and Almeida responded, “[w]oah . . . He put his name on the dotted line,” and “[w]ell there’s nothing implying anything other than getting what Dowen is owed.” Almeida PSR ¶ 17. It is notable that Almeida appeared to know what Dowen was referring to and expressed no surprise at what had occurred. Then, when Dowen asked Almeida to help with intimidating Victim 1’s sister, Almeida was on board, responding that her location was super close to him, that “I’m [gonna] make sure it’s not a trap,” and that he was going to wait till the daytime to do it. In sum, the government’s recommendation of 46 months, below the low end of the Guidelines, adequately accounts for the mitigating circumstances in Almeida’s history. The Court should not go any lower.

## IV. Conclusion

The United States respectfully requests that the Court impose a custodial sentence of 210 months for Dowen, followed by 10 years of supervised release, and the agreed upon restitution and forfeiture.

The United States respectfully requests that the Court impose a custodial sentence of 46 months for Almeida, followed by 3 years of supervised release.

DATED: July 31, 2026

/s/
LINA PENG
Assistant United States Attorney